❒ Original ❒ Duplicate

CLERK'S OFFICE
A TRUE COPY
Apr 01, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Information about the location of the cellular telephone assigned call number 414-345-7141, as further described in Attachment A

Case No. 25-M-336 (SCD)

Matter No. 2025R00094

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ______ District of ______
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 4-15-25 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Stephen C. Dries.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☑ for 30 days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ______.

Date and time issued: 4-1-25. 9:30 am

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ______________________

______________________________
*Executing officer's signature*

______________________________
*Printed name and title*

## ATTACHMENT A

**Property to Be Searched**

1. Records and information associated with the cellular device assigned **call number 414-345-7141** (referred to herein and in Attachment B as "the Target Cell Phone"), with listed subscriber(s) Trayveon Roy, used by Roy**,** that is in the custody or control of Verizon Wireless (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Rd, Bedminster, NJ 07921.

2. The Target Cell Phone.

# ATTACHMENT B

## Particular Things to be Seized

### I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period October 1, 2024, to the present:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

   viii. Means and source of payment for such service (including any credit card or bank account number) and billing records

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone, including:

1. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

2. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical

GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

The Honorable William E. Duffin has also issued an order pursuant to 18 U.S.C. § 3123, dated March 27, 2025, for such information associated with the Target Cell Phone.

c. Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 21 U.S.C. § 841(a)(1), 843(b), and 846 involving Quentin Apkarian, Joey Miramontes, Trayveon Roy, and others known and unknown, during the period of October 1, 2024, to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are

authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

CLERK'S OFFICE
A TRUE COPY
Apr 01, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin



# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information about the location of the cellular telephone assigned call number 414-345-7141, as further described in Attachment A

Case No. 25-M-336 (SCD)

Matter No. 2025R00094

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the ______________ District of ______________, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843 (b), and 846 | Distribution of a Controlled Substance, Possession with the Intent to Distribute a Controlled Substance, Use of a Communication Facility in Furtherance of a Drug Trafficking Offense, and Conspiracy to Distribute a Controlled Substance. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* ______________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Mark Haleen, FBI TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 4-1-25

[signature]
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Mark Haleen, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **414-345-7141** (the "**Target Cell Phone**"), whose service provider is Verizon Wireless ("Service Provider") a wireless telephone service provider headquartered at 180 Washington Valley Rd, Bedminster, NJ 07921. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the Target Cell Phone.

3. I am a sworn law enforcement officer with the Village of Mount Pleasant and a sworn Task Force Officer with the Federal Bureau of Investigation (FBI), with authority to investigate federal offenses including violations of Titles 18 and 21 of the United States Code.

4. I have been employed as a Law Enforcement Officer with the Village of Mount Pleasant (Wisconsin) since September 2010 and a sworn Federal Task Force Officer with the FBI

since January 2020. I have obtained a Bachelor of Science Degree in Sociology from Central Michigan University. I have been involved in the enforcement and investigation of numerous violations of federal and state law to include drug trafficking investigations, firearm trafficking investigations, and violent crime related cases. I have personally conducted and participated in numerous investigations that have given me familiarity with the various methods that criminals use to conduct illicit firearm and narcotics transactions in violation of federal law.

5. As part of my duties, I investigate criminal violations relating to narcotics trafficking, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 21, United States Code, Sections 841, 843, and 846. By virtue of my employment as a federal task force officer and prior law enforcement experience, I have knowledge of and/or performed various tasks, which include, but are not limited to:

a. I have functioned as both a case agent and co-case agent in numerous investigations into illegal drug distribution conspiracies.

b. I have interviewed witnesses, confidential human sources (CHS) and sources of information (SOI) relative to the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments);

c. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States.

d. I have also relied upon informants to obtain controlled substances from dealers.

e. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized.

f. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, fentanyl, cocaine, cocaine base, ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances.

g. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded.

h. I know that drug traffickers often use electronic equipment and cellular telephones to conduct drug trafficking operations.

i. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

j. I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking.

k. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement officials.

6. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

7. In addition to my experience in the investigation of individuals involved in federal criminal offenses, I also have knowledge and experience in the apprehension and prosecution of individuals involved in federal criminal offenses. I am familiar with and have experience in the use of devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of those devices and their locations.

8. As such, I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

9. The facts in this affidavit come from: my personal observations, my training and experience, my review of documents, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

10. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, §§ 841(a), 843(b), and 846 have been committed, are being committed, and/or will be committed by Quentin Apkarian, Joey Miramontes, Trayveon Roy, Joshua Ramos, and others known and unknown. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

11. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

12. The United States, including Federal Bureau of Investigation is conducting a criminal investigation of Quentin Apkarian, Joey Miramontes, Trayveon Roy, Joshua Ramos, and others, known and unknown, regarding possible violations of Title 21 U.S.C. §§ 841(a)(1), 843(b), and 846 (Distribution of a Controlled Substance, Possession with the Intent to Distribute a

Controlled Substance, Use of a Communication Facility in Furtherance of a Drug Trafficking Offense, and Conspiracy to Distribute a Controlled Substance). As detailed below, members of the Apkarian Drug Trafficking Organization ("Apkarian DTO") are actively selling cocaine and fentanyl in southeastern Wisconsin.

13. In September 2024, case agents learned that Quentin Apkarian had recently been released from incarceration within the Wisconsin Prison System and had recently moved into 2322 Kae Court, Mount Pleasant, Wisconsin with his girlfriend, Kiara Ramos. Apkarian was released from custody on extended supervision for underlying offenses including Armed Carjacking and Operating a Motor Vehicle without Owner's Consent. Kiara Ramos was previously on Wisconsin Department of Corrections Supervision for Maintaining a Drug Trafficking Place from a 2019 conviction.

14. Case agents contacted the Wisconsin Department of Corrections and spoke with Gang Specialist Megan Rasmusson who reviewed Department of Corrections records and found Apkarian to be a documented Gangster Disciple gang member. Rasmusson was able to provide a known phone number of 414-550-7820 for Apkarian.

15. Case agents were able to listen to phone calls placed from the Wisconsin Prison System to Apkarian's cellular phone (414-550-7820) by incarcerated inmates. Based on my training and experience, and my review of a substantial number of phone calls placed by inmates within the Wisconsin prison system, I know that when a call is placed by an inmate, a recorded message advises the recipient that the call is coming from a prisoner and that the conversation is being recorded. Each of the prison phone calls involving (414) 550-7820 included this advisement. During those calls, case agents determined that Apkarian is likely distributing illegal controlled substances in the southeast Wisconsin area. Many of the calls were placed by Inmate Christopher Badgett, a known associate of Apkarian. Each prisoner is assigned a unique identifying number

to be used to place phone calls from the institution. Badgett's identifying number was used to place the calls to (414) 550-7820 and Badgett identified himself during at least one of the phone calls. During several of the calls, Apkarian and Badgett discuss illegal controlled substance distribution, how much money Apkarian is making selling controlled substances, and how Badgett is going to get back into selling controlled substances upon his release (March 2025) from prison.

16. On September 18, 2024, I requested toll and subscriber records for the US Cellular number, 414-550-7820, utilized by Apkarian, through administrative subpoena. On September 26, 2024, I received and reviewed the requested records from US Cellular which showed the account subscriber for (414) 550-7820 to be Andrea Apkarian, with Quentin Apkarian as an authorized person on the account. A review of Apkarian's social media accounts and Department of Corrections records shows Andrea Apkarian to be the sister of Quentin Apkarian. Additionally, the US Cellular records also showed mobile number 414-550-8124, a number used by Apkarian DTO member Joey Miramontes, to be listed on the same account. I later administratively subpoenaed records for Verizon Wireless number **414-345-7141 (Target Cell Phone)** and learned that the listed subscriber is Trayveon Roy.

17. Special Agents of the Federal Bureau of Investigations and local officers have received information concerning the illegal drug trafficking activities of members of the Apkarian DTO from a confidential human source ("CHS#1"):

a. CHS#1 has been reporting to the Federal Bureau of Investigations since approximately September of 2024. CHS#1 is cooperating in exchange for monetary consideration. To date, CHS#1 has received $15,393.72 in monetary compensation for his/her cooperation with the FBI. Certain information provided by CHS#1 concerning this investigation has been corroborated from external sources, including consensually recorded audio and visual recordings, multiple controlled narcotics purchases, and a review of information contained within law enforcement databases. CHS#1 is a

convicted felon and has a criminal history that includes prior misdemeanor convictions for traffic offenses, Bail Jumping, Disorderly Conduct, Possession of THC, Resisting an Officer, and Retail Theft. CHS#1 has prior felony convictions for Burglary and Bail Jumping. CHS #1 has a pending criminal traffic charge for operating a vehicle after revocation. CHS#1 is cooperating with other law enforcement officers in hopes of receiving consideration on that open criminal traffic matter. I have discussed CHS#1 cooperation with the other law enforcement officer and CHS#1 has provided reliable cooperation to that agency. CHS #1 has no criminal convictions in the past five years. At no time during CHS#1's cooperation with the FBI have I found CHS#1 to have provided false information or engage in untruthful or deceptive behavior. As further detailed below, during controlled narcotics purchases, CHS#1 surreptitiously recorded the narcotics transactions at my direction. Case agents later debriefed CHS#1 concerning what occurred during each transaction and then compared CHS#1's version of events with the recordings and case agent observations. Each time, CHS#1's information was corroborated by these independent sources. The basis of CHS#1's information detailed below is CHS#1's own personal observations and participation on the controlled narcotics purchases. Within the context of the information detailed and relied upon for purposes of this application, I believe that CHS#1 is credible and that CHS#1's information is reliable.

18. Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant (such as CHS#1) purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, s/he is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring

equipment to the case agents. The informant is again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs is then field tested by the case agents for the presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. If applicable, all of the calls to the target by the informant are consensually recorded calls under the direction and control of case agents and made in the presence of case agents. Additionally, case agents observe the informant dial the target's number on each occasion and the contact is verified through telephone records. When communication between the informant is done via electronic means (such as use of Facebook Messenger), case agents review the electronic communications, verify the user/profile names involved, and maintain a copy of the communications as part of the case file. Unless otherwise noted, the controlled buys and telephone contacts summarized below were conducted pursuant to the above procedures. Further, unless otherwise noted, all drug results are based on presumptive field testing and field weights without packaging.

19. Starting in October 2024, CHS#1 began conducting buys from Apkarian DTO members on behalf of law enforcement. To date, CHS#1 has conducted over 10 buys from Apkarian DTO members for marijuana, cocaine, fentanyl, and/or firearms. Recent examples are detailed below.

20. Based on my training and experience, and the investigation to date, I believe that Trayveon Roy is Apkarian/Miramontes' supplier for fentanyl pills. Roy is the user of Wisconsin based telephone number (414) 345-7141. Roy is a high-level fentanyl trafficker and source of fentanyl supply for the Apkarian DTO. Roy is a known associate of Apkarian and has a last known address of 3018 N. Palmer Street, Milwaukee, Wisconsin, 53212. Roy has juvenile Felony adjudications for Armed Robbery (Date of Adjudication 09/06/2015), Armed Robbery (Date of Adjudication 09/06/2015), Burglary (Date of Adjudication 07-05-2017) and has adult felony

convictions for Prisoner Expel Bodily Substances (Date of Conviction 08-24-2018), Adjudicated Delinquent Possess Firearm (Date of Conviction 08-09-2021), and Drive or Operate Vehicle without Owner Consent (Date of Conviction 01-19-2024). Roy is currently on Department of Corrections Supervision with an unknown maximum discharge date. Case Agents believe Roy to be the user of 414-345-7141 because: (1) 414-345-7141 is the number Roy provided to the Wisconsin Department of Corrections as his personal phone number; (2) 414-345-7141 links to a CashApp account with the username "Bigdaddy Tray" with a photograph of Trayveon Roy; and (3) Trayveon Roy is the listed subscriber per Verizon Wireless subscriber records.

**Fentanyl Buy on March 3, 2025**

21. On March 3, 2025, CHS#1 purchased 100 pills of fentanyl from Miramontes on behalf of case agents. This buy had been previously arranged between CHS#1 and Apkarian and case agents believed that Miramontes would deliver the drugs. CHS #1 placed a recorded phone call to 414-550-8124 and spoke with Miramontes. This conversation was consensually recorded, preserved, and done in the presence of case agents. CHS #1 inquired about Miramontes' whereabouts and when Miramontes would be arriving. Miramontes told CHS #1 that Miramontes had to pick up his children and drop them off, but he was currently on his way. Miramontes stated he would be there in 18 minutes.

22. Case agents searched CHS #1, provided CHS #1 with $920 in buy money, and outfitted CHS #1 with a recording device. Case agents followed CHS #1 to the buy location where physical surveillance observed Miramontes parked in the Culver's parking lot as a passenger in a Grey Chevrolet Equinox with Wisconsin Registration AWV-7542. Physical Surveillance observed Miramontes exit the Equinox and enter into CHS #1's vehicle. A short time later, physical Surveillance observed Miramontes exit CHS #1's vehicle and enter back into the Equinox before the Equinox left the area back towards Milwaukee.

23. Case agents obtained a statement from CHS #1 and reviewed the audio/video recordings of the controlled buy, which showed: Miramontes got into CHS #1's vehicle and produced a plastic container from his pocket. Miramontes removed a plastic baggie with pills and handed them to CHS #1 for inspection. Miramontes and CHS #1 discussed the quality of the pills and how expensive they are. CHS #1 gave Miramontes the $920 in buy money in exchange for the pills and further discussed obtaining a larger quantity of pills next time if the price is right.

24. As CHS #1 was driving back to the predetermined meeting location, CHS #1 received a voice call from (414) 550-7820 at 4:33PM and spoke with Apkarian. This conversation was consensually recorded by CHS#1, preserved, and reviewed by case agents. Case agents reviewed administratively subpoenaed call records for (414) 550-7820 and confirmed that (414) 550-7820 had a connected voice call with CHS#1 during the timeframe reported by CHS#1. The following is a transcription of that recorded call:

**CHS#1:** "It just came. I just got 'em. I was just explaining to him, though, bro, like low key to the 750 was kind of a lot, and the 920 was a little bit crazy, but I'm going to grab it the first time. But you got to let them know that nigga know you're getting them from that, like, you know how much these motherfuckers cost pretty much. You know what I'm saying? Like, try to get a better price.

**APKARIAN:** "Yeah, see I ain't really know I ain't be fucking with them"

**CHS #1:** "That's what I'm saying. So, I know he probably gave you ridiculous ass price.

**APKARIAN:** "That's why when you told me you had like a G or 1200, I'm thinking like, oh, shit this is a good price then."

**CHS #1:** "Yeah. That's what I had in my pocket pretty much. You know what I'm saying?"

**APKARIAN:** "Yeah. That's why I ain't know, nigga. I don't fuck with them bitches, bro."

**CHS #1:** "I feel you. That's what I'm saying. So, like the next rip, if you're really trying to make some money off these motherfuckers, let him know how

much you know, how much these motherfuckers be like, bro. People in Racine saying they paying three, four dollars a pop for 'em, for a hundred packs. And then nothing more than five racks for a K-Pack. You know what I'm saying?"

**APKARIAN**: "How much for a K-Pack?"

**CHS #1:** "Nothing more than five, bro. Motherfucker can get a K-Pack for like three Gs down here. But they ain't hitting like that."

**APKARIAN**: "Well, let me know how them hitting."

**CHS #1:** "I'm about to let you know. I'm about to let you know right away so."

**APKARIAN:** "I can see is them niggas actually got some good shit. Because if that's the case, I'll tell them niggas I'll about a thousand of them bitches."

**CHS #1:** "Yeah, a K-Pack for sure. But it got to be under five, bro, for it to be even worth it. I'll pay it this time just to see what it is type shit you know, plus I had the 50 sold for 750 right away. So, but I had to go in my pocket 170 right now. But I ain't tripping I'm gonna have 50 pills for 170. But he going to let me know if they're garbage or not, you know. So, basically just."

**APKARIAN:** "All right. So let me call this nigga real quick cause he suppose to meet up with me"

25. Based on my training and experience, I believe that this call involved: CHS#1 confirming that CHS#1 just acquired the pills from Miramontes ("…I just got 'em…"). Apkarian confirms that he does not usually deal with the pills ("…I ain't really know I ain't be fucking with them…"). CHS#1 explains that the price CHS#1 just paid for the pills costs CHS#1 money ("…but I had to go in my pocket 170 right now. But I ain't tripping I'm gonna have 50 pills for 170…"). CHS#1 further explains that CHS#1 is going to have someone determine the quality of the pills before placing a larger order ("…But he going to let me know if they're garbage or not…" and "…it got to be under five, bro, for it to be even worth it. I'll pay it this time just to see what it is type shit you know, plus I had the 50 sold for 750 right away.") They also discuss the price point for 1000 pills ("K-Pack"). In this context, based on my training and experience and discussions

with CHS#1, I believe that the term K-Pack refers to a package ("Pack") of 1000 (one "K") of pills.

26. Case agents tested the pills purchased by CHS#1 using a Fentanyl test kit and received a positive reaction for the presence of Fentanyl. The pills weighed 11.1 grams.

27. Case agents reviewed the administratively subpoenaed call records for (414) 550-7820 for March 3, 2025, and found that Apkarian initiated a three-way call with 414-550-8124 (Miramontes) and 414-345-7141 (Trayveon Roy/**Target Cell Phone)** at 1:43PM which lasted for 6 minutes and 46 seconds. I suspected that Roy may be the supplier of the 100 Fentanyl pills that Miramontes provided to CHS#1 during the March 3, 2025, controlled buy. If that is the case, I would expect that if CHS#1 ordered additional fentanyl pills from Apkarian DTO members, said DTO members would contact Roy.

**Fentanyl Buy on March 7, 2025**

28. CHS#1 conducted a buy involving Apkarian and Miramontes on March 7, 2025. According to CHS#1, the deal was set up between Apkarian and CHS#1 for 1000 pills (referred to in their communications as a "K-Pack"). Case agents met with CHS #1 at approximately 10:30AM and provided CHS #1 with the $5200 in buy money and audio video recording equipment. CHS #1 was followed to the buy location where Miramontes and Apkarian were waiting in Apkarian's Gray BMW X2 (AXP7072) in the parking lot. Physical surveillance observed the BMW exit the interstate and enter into the lot at approximately 11:10AM. Physical surveillance observed Miramontes enter into CHS #1's vehicle while Apkarian stayed in the BMW. Inside the vehicle, according to CHS#1, Miramontes produced the bag of fentanyl pills from his pocket and provided them to CHS #1 in exchange for the $5200. During the buy, case agents observed Apkarian roll down his window and speak to CHS #1 through the open vehicle windows. Based on my review of the recording made by CHS#1 during the controlled buy, while in the vehicle, Miramontes said

that he didn't know what a "K-Pack" looked like and stated, "if it's short let us know so we can get up on them." This conversation was consensually recorded by CHS#1, preserved, and confirmed by case agents.

29. Case agents later tested, weighed, and counted the fentanyl pills and found the total weight to be 88.1 grams and a fentanyl swipe test revealed a positive reaction for the presence of fentanyl. Case agents counted the pills and found the total to be 770. Case agents alerted CHS #1 of the shortage and requested CHS #1 call Apkarian and complain.

30. On March 7, 2025, at approximately 3:36PM CHS #1 placed a recorded phone call to (414) 550-7820 and spoke with Apkarian. This call was placed outside of my presence however at my direction and consensually recorded by CHS #1. I confirmed that the telephone number contacted by CHS#1 was, in fact, (414) 550-7820. Below is a transcription of a relevant portion of the call:

**CHS #1:** "Yo"

**APKARIAN:** "What's the word?"

**CHS #1:** "So I just had my guy come and pick them up from work, and he counted 'em bro, and it was only like 770, or close to it"

**APKARIAN:** "For real?"

**CHS #1:** "Swear to god, bro"

**APKARIAN:** "I'm gonna have bro hit this nigga up man"

**CHS #1**: "that was like everything I was gonna make out of it pretty much [UI]"

**APKARIAN:** "Thas what I'm saying, you sure, you watched him count 'em?"

**CHS #1:** "I'm positive, this man would not lie to me. I mean, I looked at the bag and it looked a little bit short already, you know"

**APKARIAN**: "That's kinda what I told Bro, I was like did you count ‘em and he's like no I didn't count ‘em. I was like man, you sure that's a thousand? He was like it look like a thousand, I'm like ehhh."

**CHS #1:** "They looked a little small but I'm like shit, if its theirs, it's cutting it close [UI]"

**APKARIAN**: "You said how much was it?"

**CHS #1:** "It's like 770, 775 type shit. If he was off, he was prolly only off by like 5"

**APKARIAN:** "Right, so like 200 short"

**CHS #1:** "200 for sure yeah"

**APKARIAN**: "Alright, I'm gonna hit this nigga up and tell him to hit dude up. He gotta run that shit."

**CHS #1**: "Tell him try to make it right bro, cause that shit"

**APKARIAN:** "Yeah I got you, I'm gonna hit dude up and let him know he short."

**CHS #1:** "Alright, I appreciate it."

**APKARIAN:** "Alright. Alright bro [UI]"

**CHS #1:** "Alright let me know."

31. Based on my training and experience, I believe that this conversation involved: CHS#1 complaining to Apkarian that Miramontes supplied 770 fentanyl pills, not the agreed upon 1000 pills ("It's like 770, 775 type shit..." and "That's kinda what I told Bro, I was like did you count ‘em and he's like no I didn't count ‘em. I was like man, you sure that's a thousand? He was like it look like a thousand, I'm like ehhh."). Apkarian agreed to contact Miramontes and let him know ("…I'm gonna hit dude up and let him know he short."). Based on this, I believe that Apkarian is using (414) 550-7820 to engage conversations in regarding drug trafficking.

32. Case agents reviewed administratively subpoenaed call records and found that immediately after the above call with Apkarian, (414) 550-7820 placed an outgoing call to

Miramontes' phone (414) 550-8124). Miramontes' phone (414-550-8124) then placed several outgoing calls to Trayveon Roy's phone at 414-345-7141 (**Target Cell Phone)**. Based on this pattern of calls, and my training and experience, I believe that Apkarian (using (414) 550-7820) alerted Miramontes (using 414-550-8124) that the prior fentanyl pill deal with CHS#1 was short by 200 pills. I believe that this, in turn, prompted Miramontes (using 414-550-8124) to contact the supplier of those pills (Roy at 414-345-7141—the **Target Cell Phone**) in order to acquire an explanation for the shortage and/or obtain the missing fentanyl pills. Based on this, I believe that Apkarian is using (414) 550-7820**,** that Miramontes is using 414-550-8124, and Roy is using 414-345-7141 (**Target Cell Phone)** to engage in conversations regarding drug trafficking.

33. On March 7., 2025, at 3:46PM (after phone conversation above), Apkarian messaged CHS #1 via Apple iMessage from 414-550-7820. This conversation was consensually recorded by CHS#1, preserved, and reviewed by case agents. In said message, Apkarian told CHS #1 that, "Bro hitting them up now". A short conversation ensued wherein Apkarian told CHS #1 that they (in context, Miramontes and Apkarian) are going to make this right. At approximately 5:38PM Apkarian messaged CHS #1 and told CHS#1 that they have the remainder of the pills for CHS #1, and arrangements were made for CHS #1 to obtain them the following day. I reviewed the administratively subpoenaed call records for 414-550-7820 (Apkarian) and 414-550-8124 (Miramontes) and found that at 3:38PM, 414-550-7820 placed an outgoing call to 414-550-8214 (Miramontes). Immediately after this call, Miramontes (414-550-8124) placed an outgoing call to 414-345-7141 (Trayveon Roy/ **Target Cell Phone**).

34. Based on my training and experience, I believe these messages were in reference to the prior fentanyl pill deal in which Miramontes/Apkarian shorted CHS#1 by over 200 pills and that Miramontes and/or Apkarian had now obtained the remainder of the pills to provide to CHS#1 from their supplier(s) (believed to be Roy).

**Fentanyl Deal on March 8, 2025**

35. On March 8, 2025, at approximately 10:30AM, CHS #1 contacted Apkarian through iMessage (at the (414) 550-7820). This conversation was consensually recorded by CHS#1, preserved, and reviewed by case agents. In sum, Apkarian told CHS #1 that Miramontes was already on the way to meet CHS #1 and that he would be there in 25 minutes as outlined in the following text messages:

**APKARIAN:** "Meet bro at the pilot?"

**CHS #1:** "When?"

**CHS #1:** "Hml"

**APKARIAN**: "Ok I'm on the phone rn hold up"

**APKARIAN:** "Right now"

**APKARIAN:** "He will be there in like 25 minutes."

**APKARIAN:** "You on your way?"

**CHS #1:** "I just talked to him we bout to link at the hotel I got the kids."

36. At 10:45AM CHS #1 placed an outgoing call to 414-550-8124 (Miramontes). This call was done outside the presence of case agents and was not recorded. According to CHS#1, Miramontes told CHS #1 that Miramontes was on the way, and they agreed to meet at the Travel Lodge Hotel, 3700 Northwestern Avenue, Racine, Wisconsin in the parking lot. I later reviewed CHS#1's cellular telephone and confirmed that a voice call occurred between CHS#1 and 414-550-8124 (Miramontes).

37. At approximately 11:10AM, case agents met with CHS #1 and outfitted CHS #1 with recording devices and followed CHS #1 to the Travel Lodge Hotel. At 11:08AM, physical surveillance observed a black Mercedes Benz sedan with Wisconsin Registration AZE6977, registered to Apkarian, arrive in the parking lot. CHS #1 arrived shortly after, and surveillance

officers observed Miramontes exit the Mercedes and enter into CHS #1's vehicle. CHS#1 later advised case agents that during the controlled buy, Miramontes provided CHS #1 with a knotted baggie of fentanyl pills and explained to CHS #1 how Miramontes was able to get the supplier to acquiesce and make up the difference. Further, during the controlled buy, Miramontes talked about how the supplier is Apkarian's connect and Miramontes only just met him. I later reviewed the consensually recorded audio/video of this interaction and found that it was consistent with CHS#1's statements about what occurred during the deal. Below is a portion of the relevant parts of the conversation:

**MIRAMONTES:** "I had to get on a nigga ass and shit."

**CHS #1:** "Man Bro.. I'm talking about, I was at work, my stomach in my back, I was like"

**MIRAMONTES:** "Bro called me he like, he like, yeah bro them motherfuckers were short 200 or 230 or 200 some shit"

**CHS #1:** "He knew."

**MIRAMONTES:** "On my life I right called dude I'm like hey Bro I'm like whats happening with them other 200, and he's like, what you mean. I was like man, uh, never mind, never mind, never mind. I was like I was suppose to call somebody else and I hung up.

**CHS #1:** "Yeah"

**MIRAMONTES:** "And then I was like where you at? So I'm like where you at, I need to grab another pack, I need to grab another K-pack.

**CHS #1:** "Yeah"

**MIRAMONTES:** "So I'm like where you at. He like, man, meet up with right here on 43rd. I said alright, I go right over there.

**CHS #1:** "Take the K"

**MIRAMONTES**: "I didn't take the K-Pack, but I just told him brig another, bring a K-pack. Cause that was the only to be able to, be able to just in case he got an idea and shit"

**CHS #1:** "yeah"

**MIRAMONTES:** "I should of took the K-Pack but I told him straight up, I was like yeah nigga them bitches was short 200. And he was like damn I didn't count em but my bitch counted em this and that. I was like I don't care who counted em, I said.."

**CHS #1**: "Don't you know how to count what the fuck"

**MIRAMONTES:** "I was like bro listen, I said, bro at the end of the day nigga I was like don't let that shit happen again, and shit, cause that shit make me look bad and shit.

38. After Miramontes exited CHS#1's vehicle, CHS#1 met with case agents. CHS#1 turned over the suspected pills to case agents. The suspected fentanyl was later field tested positive for the presence of fentanyl, weighed approximately 21.1 grams, and was placed on inventory.

39. Based on the aforementioned information, I believe that Roy, Apkarian and Miramontes are involved in drug trafficking. Moreover, I believe that Apkarian is using, and continues to use, (414) 550-7820, that Miramontes is using, and continues to use, 414-550-8124, and that Roy is using, and continues to use, 414-345-7141 (**Target Cell Phone)**, to help facilitate their drug trafficking activities.

40. I believe that the historical location data requested will assist in identifying DTO stash locations and corroborating the locations of DTO members during relevant events such as the previously completed controlled buys. I believe that the call detail records requested will help identify other DTO members and potential sources of supply. I believe that the requested prospective location data will assist in proactive surveillance of DTO members and will aid in the identification of DTO members/suppliers, stash locations, and meeting locations.

41. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

**Cell-Site Data**

42. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

43. Based on my training and experience, I know that Verizon also can collect per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data

estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

**E-911 Phase II / GPS Location Data**

44. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available.

**Pen-Trap Data**

45. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile

Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

## Subscriber Information

46. Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Cell Phone's user or users and may assist in the identification of co-conspirators and/or victims.

47. I have a general understanding of how the cellular telephone network operates. I am aware that cell sites (towers) are strategically placed by cellular service providers, to provide a seamless operation so people can travel virtually anywhere and make or receive an uninterrupted call, send or receive text messages, or initiate a data session via their cellular phone. Usually, cell sites will be mounted high on a large pole, building, or other structure which provides line of sight with the population below. Cell sites are typically divided into sectors, which are made up of

antennas connected to cellular radio transceivers. Each sector is mounted on the cell site and faces a specific direction to provide maximum cellular coverage for the people in the area. The range of the cell site and sectors depends on many factors to include environmental and geographic factors and whether it is located in a highly populated, urban environment or desolate rural area. Cell site location information (CSLI) does not provide an exact location of a cell phone; the basic call detail record data only provides the physical location of the cell site (latitude and longitude) and a direction (azimuth) the antennas are facing from the cell site.

48. I am aware when a person either initiates or receives a voice call, text message, or a data session (usage event) from their cellular device, the device broadcasts signals to the cell site that routes its communications. These signals include a cellular device's unique identifiers as well as details about the usage event. I am also aware cellular service providers collect and store these usage event details (transaction records) associated with cellular phone numbers during the normal course of business. The usage event records, commonly referred to as call detail records, stored by their respective cell phone company, mostly contain the following information with some exceptions based on the specific carrier: Date, time, type of event, duration, phone number initiating the usage event (called, calling), even if caller identification is blocked by the calling party, text message transaction data, the international mobile equipment identifier (IMEI), the international mobile subscriber identifier (IMSI), IP packet data session logs, and cell site location and sector information at the beginning and ending of each usage event.

49. I believe such information is relevant and material to the ongoing criminal investigation as it may provide investigators with information supporting or refuting the suspect's alibi, and assist with determining other unidentified co-conspirators, and/or show the general geographic location of the target device before, during, and after the commission of the crime.

This is basic information and does not provide an exact location of the person's cell phone nor does it identify the other parties.

50. I am aware that obtaining and preserving historical cell phone call detail and specialized location records could also prove to be fruitful, as such records could assist investigators not only with identifying those who may have been in contact with the victim(s) or potential co-conspirators, but may also allow investigators other opportunities, including, but not limited to, confirmation or the disproving of alibis, statements, and other observations.

51. I know that these records such as those associated with the target phone, are not kept or preserved indefinitely by the cellular service providers and are purged at different intervals. Obtaining and preserving these records at this point in the investigation will ensure the investigators assigned to the case will have them available, and if the case were to go "cold", future investigators will have access to the records which would otherwise likely not be obtainable. Not only could the preserved records assist in proving one's guilt, they could also assist in proving one's innocence.

52. I am aware cellular service providers maintain specialized location records consisting of engineering data. These data sets are used by the providers to troubleshoot coverage areas and report back on potential dead spots, all with the intent to oversee and optimize the cellular network. Specialized location records typically contain data for every usage event, to include technology details (e.g. voice, text, data), resource usage, and call failure information. They can also include data for incomplete calls (e.g. denied calls and set-up failures). These records not only include the basic call detail records, but also an estimation of the target phones location (Latitude and longitude) with a possible accuracy radius, and/or the distance from the cell site at the time of the usage event. Utilizing specialized location records can provide investigators with a much smaller footprint of a target phones location and could place a target phone within close

proximity of a crime scene before, during and after a crime. Each carrier uses their own nomenclature to describe the technology used to obtain this data including: NELOS (Network Event Location System) – T-MOBILE, RTT (Round Trip Time/Return Trip Time/Real Time Tool) - Verizon &amp U.S. Cellular, PCMD (Per Call Measurement Data) – Sprint & U.S. Cellular, and TDOA (Time Difference of Arrival) or Timing Advance Information – T-Mobile & Metro by T-Mobile. I believe this information is relevant and material to the investigation as it provides supplemental geo-location information which, while not precise enough to identify a specific house, is accurate enough to provide block-level accuracy, in some cases. Investigators can use this information to correlate existing fact patterns and timelines to confirm or refute prior statements and/or evidence regarding the location of the target device.

53. I am seeking evidence of communication between identified subject(s) and previously unidentified individuals and entities. In my training and experience, associates communicate together via phone calls, text messages, and social media applications via data sessions and these communications most commonly occur on or through cellular devices.

54. In my training and experience individuals often use digital devices and cellular devices to post messages to others on social networking applications. In my training and experience it is possible for cellular phone users to use a variety of messaging platforms including the cellular SMS and MMS technology, as well as third-party applications like Facebook Messenger, WhatsApp, Snapchat, iMessage, and many other applications. Therefore, I seek to search all the communication evidence maintained by the service provider.

55. I am also seeking evidence of association. I know that establishing the association of co-conspirators is important in proving a concert of action between multiple persons. In my training and experience, one of the most effective methods of linking co-conspirators together is by reviewing the call detail records maintained by the cellular service providers. In my training

and experience, associates communicate together via voice calls, text messages and third-party applications by means of a data usage event, therefore I am seeking the call detail record evidence to demonstrate the associations of the individuals in this case. Because this evidence is intended to be used to show associations of the user/owner of the device and co-participants, I am seeking the above items regardless of the dates the information was created.

56. I am aware cellular service providers offer their customers optional free or paid backup digital storage for some of the content stored on their device. These services are offered to secure and restore their digital information in the event their mobile device is lost or stolen. Because these digital storage services are remote and transparent to the consumer, they are often referred to as 'cloud' storage. Customers can elect to digitally store the contents of their electronic phone book including details of their contacts, names, phone numbers, email addresses, and other data, calendar events, short message service (SMS) messages, commonly referred to as text messages, multimedia message service (MMS) messages, consisting of pictures, videos, and/or audio files with or without accompanying text, call logs of incoming, outgoing, and missed calls, digital images and videos, music and audio files, and electronic files such as documents and spreadsheets. I believe this information is relevant and material to the matter at hand as the contents of the remote digital storage may contain information presently unavailable to investigators including: associated identifying information from the user's contacts which would tend to identify possible suspect's, witnesses, associates, and/or co-conspirators, the content of messages sent between those parties, digital images and videos which may contain evidence of the crime under investigation, and documents related to same.

57. I am aware cellular service providers maintain a master cell site list of all cell sites within their network. These cell site lists will include the specific switch, cell site number, name, physical address, latitude and longitude of the cell site, all sectors associated with each cell site,

azimuth, and beam-width of each related sector. When reviewing call detail and specialized location records from the carriers, the records may only reference a specific switch, cell and sector, or LAC and CID/eNodeB ID, related to each usage event; they usually will not include the location (latitude and longitude) of the actual cell site and azimuth of the sector. It becomes necessary to reference a cell site list in order to plot the exact location of the cell site and to identify the azimuth of the sector used associated with specific usage events.

58. Also, in the course of the investigation and review of the call detail and specialized location records, it may become necessary to visualize all cell sites within a geographic region of interest, not just the cell sites used by the target phone. It is just as important to show cell sites not used by a target phone, as it is to show cell sites used. By obtaining the master cell site lists from the cellular service providers, investigators are able to plot all of the cell sites in a given region, helping investigators with disproving of alibis, statements, and other observations evidenced by the records.

59. I am seeking evidence of ownership, use, and identification of the subscriber, customer or owner of the electronic communication information contained in the records retained by the cellular service provider. I am aware, depending on whether the account is post-paid or pre-paid, a consumer must provide information to the cellular service provider. Post-paid accounts are credit based whereby a customer is provided service and then billed after the provision of services. These types of accounts require sufficient identifying information to enable the cellular service provider to make a determination regarding credit worthiness and recourse in the event the consumer defaults on their contractual agreement. The information required by most cellular service providers include the customer's personal identifying information, verified using government issued identification or other means, residential address, alternate contact phone numbers, and electronic mail (email) address(es). Additional information can include the type of

service plan, additional features subscribed to, such as cloud storage and additional phones on the same account, device type and unique identifiers including IMEI and IMSI, method and source of payment information including financial institution and direct billing checking account numbers, credit or debit card numbers, and/or third-party payment processors, and customer service representative account comments and notes. I believe this information is relevant and material to the matter at hand as it serves multiple purposes including: identifying the subscriber to the target phone number, providing investigators with additional information and leads including subscriber address, additional phone numbers, and/or email addresses, device identifiers used to correlate any seized phones with the account, previously unidentified phones subscribed to on the same account, and financial information. I know that ownership and control of a digital device can be placed at issue through a simple denial, "that is not my phone." In my training and experience some of the best ways to establish ownership and control are by reviewing account information and subscriber records from cellular service providers.

60. I am aware of the ease of being able to purchase a pre-paid cellular phone, and how it has impacted law enforcement's effort when attempting to identify criminals and locate wanted felons. It becomes very difficult, sometimes impossible, to determine the identity of a subscriber when the pre-paid providers do not require the identity of the person when obtaining/purchasing a pre-paid cellular phone. From prior training and experience, I know of many cases where pre-paid phones were used by suspects to further facilitate their criminal behavior, with the intent of concealing their true identity. Despite the lack of personally identifiable information, prepaid accounts can still provide investigators with information to identify the user. By examining the call detail and specialized location records of a pre-paid target phone, investigators can examine call and text incoming and outgoing usage events to help identify co-conspirators, associates, friends and family, who could help identify the party utilizing the pre-paid phone. Additionally,

pre-paid services typically require some mechanism of payment including pre-paid cards, cash payments at retail establishments, or via an online portal. The financial information may assist investigators with identifying the locations where the pre-paid cards were purchased, the location of the retail establishments used for cash payments, and/or associated online account information and Internet Protocol (IP) addresses.

## AUTHORIZATION REQUEST

61. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

62. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

63. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

64. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until **30 days** after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target

Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

65. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

# ATTACHMENT A

## Property to Be Searched

1. Records and information associated with the cellular device assigned **call number 414-345-7141** (referred to herein and in Attachment B as "the Target Cell Phone"), with listed subscriber(s) Trayveon Roy, used by Roy**,** that is in the custody or control of Verizon Wireless (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Rd, Bedminster, NJ 07921.

2. The Target Cell Phone.

## ATTACHMENT B

### Particular Things to be Seized

### I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period October 1, 2024, to the present:

i. Names (including subscriber names, user names, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone, including:

1. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

2. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile

Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

The Honorable William E. Duffin has also issued an order pursuant to 18 U.S.C. § 3123, dated March 27, 2025, for such information associated with the Target Cell Phone.

c. Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

   i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

   ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 21 U.S.C. § 841(a)(1), 843(b), and 846 involving Quentin Apkarian, Joey Miramontes, Trayveon Roy, and others known and unknown, during the period of October 1, 2024, to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are

authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, ___________________________________, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Verizon, and my title is _______________________________. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Verizon. The attached records consist of _______________ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Verizon and they were made by Verizon as a regular practice; and

b. such records were generated by Verizon electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Verizon in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Verizon, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____________________________ _____________________________________________

Date Signature